NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

DOUGLAS GLENN CHANDLER, *Appellant.*

No. 1 CA-CR 15-0216
FILED 8-23-2016

Appeal from the Superior Court in Maricopa County
No. CR2014-000871-001 DT
The Honorable Joseph Kreamer, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

The Law Office of Kyle T. Green P.L.L.C., Mesa
By Kyle Green
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Peter B. Swann and Judge Donn Kessler joined.

---

**W I N T H R O P**, Judge:

¶1        Douglas Glenn Chandler appeals his convictions and sentences for one count of second-degree murder. Chandler's counsel has filed a brief in accordance with *Smith v. Robbins*, 528 U.S. 259 (2000); *Anders v. California*, 386 U.S. 738 (1967); and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969), stating he has searched the record on appeal and found no arguable question of law. His counsel therefore requests we review the record for fundamental error. *See State v. Clark*, 196 Ariz. 530, 537, ¶ 30, 2 P.3d 89, 96 (App. 1999) (stating this court reviews the entire record for reversible error). We allowed Chandler to file a supplemental brief *in propria persona*, but he has not done so.

¶2        We have appellate jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1), 13-4031, and 13-4033(A).[1] Finding no reversible error, we affirm.

**FACTS AND PROCEDURAL HISTORY[2]**

¶3        In 2014, a grand jury indicted Chandler, charging him with one count of second-degree of murder. *See* A.R.S. § 13-1104(A). At trial, the State presented the following evidence: both Chandler and the victim were homeless. They knew each other when they were spending time in the same area several days before the incident in the present case.

---

[1]     Absent material changes from the relevant date, we cite a statute's current version.

[2]     We view the facts in the light most favorable to sustaining the verdicts and resolve all reasonable inferences against Chandler. *See State v. Kiper*, 181 Ariz. 62, 64, 887 P.2d 592, 594 (App. 1994).

¶4        In a late evening of December 2013, Chandler—wearing a black hooded sweatshirt, dark jeans, and high-top shoes—went into a grocery store located in a Phoenix strip mall. Chandler had previously shoplifted items from that store and, on this occasion, stole candy and a bottle of beer, tucking the bottle under his waistband. He walked out of the store, stopped at the table outside of the store where the victim was sitting, took the beer out of his pants, and started drinking and conversing with the victim. Notified by the store's courtesy clerk about the theft, the store's loss prevention officer came out of the store and confronted Chandler about the theft, which Chandler denied. The victim interjected, "Doug, did you really steal the beer from the store?" Chandler immediately disclaimed "Doug" was his name, became aggressive toward the victim, and yelled at the victim, "bitch, you don't know me. I am the f--king man." The loss prevention officer stepped between them to make sure the victim was safe, and asked Chandler to leave the premises. Continuing denying the theft and that "Doug" was his name, Chandler purposely dropped the beer on the ground, and walked off. The loss prevention officer watched Chandler walk off the premises and around the stores located on the west side of the grocery store, past the fountain in the strip mall, made his way to the grocery store's west entrance where he had parked his bike (with two backpacks on board), and then rode off.

¶5        Approximately forty minutes later, the grocery store's exterior surveillance cameras captured the following: a man of a size and build similar to that of Chandler—wearing a black hooded jacket, dark jeans, and high-top shoes, and carrying a black backpack with a white emblem—walked in a distinctive manner similar to that of Chandler toward the store's east entrance. Seconds later, the cameras showed some activity under the umbrella that covered the table west of the east entrance where the victim was sitting earlier. Several seconds thereafter, the hooded man walked quickly off the premises, heading toward the fountain area; in the meantime, the victim struggled up from the table, stumbling into the store, and collapsed by a produce display. During the time period from the hooded man walking toward the east entrance to the victim stumbling into the east entrance, only the hooded man and the victim appeared outside of the grocery store in the surveillance video.

¶6        Seeing the victim stumbling in the store and nobody outside running away from the store, the loss prevention officer ran to the camera room of the store, watched the surveillance video, and realized the hooded man was Chandler. Police and emergency personnel had been called, and a police helicopter was dispatched. Meanwhile, with a description of Chandler and the direction Chandler was heading, a bystander

skateboarded around in the strip mall, and found Chandler near the fountain with his bike hiding from the helicopter spot light. Shortly after seeing Chandler leaving the strip mall, the bystander skated back to the grocery store and informed a police officer about Chandler's whereabouts.

¶7 Approximately forty minutes later, in the breezeway of another strip mall across the street from the grocery store, Phoenix Police Officer Tewers spotted Chandler in a storage unit, ducking behind his bike. Officer Tewers arrested Chandler as he was leaving the unit. At the time of the arrest, Chandler had two backpacks with him, one of which was black with a white emblem.

¶8 The victim never regained consciousness and died several days later. An autopsy indicated she died of a stab wound three inches wide and at least two inches deep behind her ear that partially severed her left vertebral artery, causing extensive rapid bleeding and subsequent death. The medical examiner opined the wound was probably caused by a knife at least three inches long with one sharp and one square side. That blade size and shape was consistent with the butterfly knife found in Chandler's backpack; per the lab technician who tested the knife, the blade likely contained female DNA.

¶9 After his arrest and subsequent *Miranda* warnings, Chandler agreed to be interviewed by Phoenix Police Officer Porter. In that interview, Chandler admitted he walked from the east side of the grocery store toward the east entrance, by the victim, and then off the premises, as captured by the store surveillance video; however, Chandler denied ever touching the victim or carrying any knives.

¶10 Chandler testified at trial in his own defense. He admitted stealing the beer out of spite but denied killing the victim. His testimony was inconsistent, both internally and with his statements during his interview with Officer Porter. Chandler kept changing his recitation as to whether, how many times, and when he went back to the grocery store area after riding off on his bike following the confrontation with the loss prevention officer. Chandler claimed he went back to the grocery store area to look for his water bottle, but was inconsistent on when he went back there and whether he found the bottle. He explained he was startled by the helicopter spot light and moved to the other strip mall across the street out of a protective habit acquired while in the military. He further claimed he went over to the breezeway in the other strip mall to sleep in a storage unit, but was inconsistent about when Officer Tewers found him and what he was doing when Officer Tewers found him.

**¶11** The jury found Chandler guilty as charged and that the offense was committed involving the use, threatened use, or possession of a deadly or dangerous instrument, specifically a knife or cutting tool. The court sentenced him to twenty-four calendar years of imprisonment, with credit for 439 days of presentence incarceration. Chandler timely appealed.

## ANALYSIS

**¶12** We have reviewed the entire record for reversible error and find none.[3] *See Leon*, 104 Ariz. at 300, 451 P.2d at 881; *Clark*, 196 Ariz. at 537, ¶ 30, 2 P.3d at 96. The evidence presented at trial was substantial and supports the verdicts, and the sentence was within the statutory limits. Chandler was represented by counsel at all stages of the proceedings and allowed to speak at sentencing. The proceedings were conducted in compliance with his constitutional and statutory rights and the Arizona Rules of Criminal Procedure.

**¶13** After filing of this decision, defense counsel's obligations pertaining to Chandler's representation in this appeal have ended. Counsel need do no more than inform Chandler of the status of the appeal and of his future options, unless counsel's review reveals an issue appropriate for petition for review to the Arizona Supreme Court. *See State v. Shattuck*, 140 Ariz. 582, 584-85, 684 P.2d 154, 156-57 (1984). Chandler has thirty days from the date of this decision to proceed, if he desires, with a *pro per* motion for reconsideration or petition for review.

---

[3] Instructions on presumption of innocence were not included in the final jury instructions. The court, however, gave the jury such instructions in the form of preliminary jury instructions before the jury heard the evidence. Further, before jury deliberation, the court properly instructed on the State's burden of proving beyond reasonable doubt. Moreover, sufficient evidence supported the verdict. In light of the totality of the circumstances, Chandler received a constitutionally-fair trial, and the omission was harmless error. *See State v. White*, 160 Ariz. 24, 31-32, 770 P.2d 328, 335-36 (1989) (stating the factors that the court must consider in its totality of the circumstances evaluation of such an omission include all the instructions to the jury and the weight of the evidence).

**CONCLUSION**

¶14        Chandler's convictions and sentences are affirmed.



Amy M. Wood • Clerk of the court
FILED:  AA